## DAM v. KIRK LA SHELLE CO.

(Circuit Court, S. D. New York. July 28, 1911.)

1. COPYRIGHTS (§ 87*)—INFRINGEMENT—COMPUTATION OF PROFITS.

On an accounting for profits made by defendant from the production of a play, which infringed a copyright of a story on which the play was based, owned by complainant, where defendant made its contracts by the season, each season should be taken as a unit in computing such profits; defendant not being entitled to credit against the profits of one season for losses incurred in another.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 81; Dec. Dig. § 87.*]

2. COPYRIGHTS (§ 87*)—INFRINGEMENT—ACCOUNTING FOR PROFITS.

On such an accounting defendant is not entitled to charge as an expense against the profits made the sum paid by it for the play, but only the reasonable value of an exclusive license for the time the play was presented.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 87.*]

3. COPYRIGHTS (§ 87*)—INFRINGEMENT—ACCOUNTING FOR PROFITS.

Defendant, a corporation having a capital stock of $10,000, $9,000 of which was owned by the widow of a former manager, is not entitled to credit on such accounting on account of a salary of $25,000 per year which it contracted to pay her, in addition to a salary as manager for her services as president, and for certain other considerations which she did not furnish, but was entitled to credit for a reasonable salary for her services only.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 87.*]

In Equity. Suit by Dorothy Dorr Dam, administratrix, against the Kirk La Shelle Company.. On exceptions to report of special master. Sustained in part.

Sur exceptions of both parties to the report of the special master stating an account of the profits derived by the defendant from a play called "The Heir to the Hoorah," which has been held to be an infringement of the dramatic rights of the complainant's intestate, as author of a story called "The Transmogrification of Dan." 166 Fed. 589; 175 Fed. 902, 99 C. C. A. 392.

Andrew Gilhooley, for complainant.

Hunt, Hill & Betts, for defendant.

WARD, Circuit Judge. Although the defendant and its immediate assignor purchased the play from the playwright, Paul Armstrong, in entire good faith and without notice of the complainant's rights, it is subject to the hard rule of having to account for all the profits it made by presenting it. Still the complainant's rights are not to be prejudiced by the allowance to the defendant of credits for unrea-

sonable payments, or for payments made without consideration to third parties.

July 8, 1905, the defendant was incorporated by Mrs. Kirk La Shelle (now Mrs. Hunt), the widow and sole legatee of a well-known theatrical manager, and two of her assistants, under the name of the Kirk La Shelle Company. The capital of the company was $10,000, in 100 shares of $100 each, all paid in by Mrs. Hunt in cash, who gave 5 shares to each of the other incorporators in consideration of their faithful services to her husband and to herself. The defendant had no notice of the complainant's claim until November 4, 1905. In the meantime, July 11, 1905, it made a contract for the purchase of the play from Mrs. Hunt for $16,000 and the assumption of all losses in connection with its presentation previous to July 8, 1905, and payment of the sum in which the disbursements had exceeded the receipts of presentation to date, viz., $5,424.70 (sixth finding of fact). There was also a separate agreement to pay Mrs. Hunt $100 a week as manager for every week the play should be presented. The defendant also made another contract with Mrs. Hunt to pay her a salary of $25,000 a year as president, including the right to use the name of her deceased husband and her agreement to finance the company from time to time (seventh finding of fact).

It is obvious that these contracts were not made for the purpose of defeating the complainant's claim, of which the defendant had then no notice, by exhausting the company's earnings. It is more likely that the purpose was to reduce the value of the 10 shares which Mrs. Hunt gave the other two incorporators. At all events, that was the effect, because the company never paid a dividend, and at the time of the accounting was in debt to her in a considerable amount for salary. It can hardly be believed that if the other two incorporators, who, with Mrs. Hunt, composed the board of directors, paid for their shares, they would have consented to this salary contract.

The complainant contends that Mrs. Hunt, owning 90 shares of the capital stock, is really the company, and in making the contract before mentioned was simply dealing with herself. But the special master has held that the company is a separate entity, and I shall follow him in this.

[1] The next question is whether the defendant's profits shall be ascertained by treating the whole period of presentation as one, or by resting at the end of each season, or of each week, or of each presentation. The special master fixed each season as a unit, and I think he was right in doing so. The defendant made its contracts for the season (twenty-third finding of fact), and kept its accounts in the same way. This is the natural way of ascertaining profits or losses. There might be cases, such as the building of costly separate machines, where each transaction could and should be considered separately. But the general business custom is to ascertain profits and losses annually.

These preliminary conclusions bring us to the question: What profits did the defendant make in each season it presented the play? The theatrical season is from September 15th to July 15th. The defend-

ant is entitled to credit against its earnings of each season all the direct expenses of the presentations of the play, together with such a proportion of its general expenses as is fairly to be appropriated to it.

[2] The special master allowed the defendant a deduction of the whole purchase price of the play, which he found to be $16,000, to the playwright, and $5,424.70, the sum by which the expenses of presentation by Mr. La Shelle in his lifetime and by his widow afterwards down to July 8, 1905, exceeded the receipts. I think the purchase of the play was, so to speak, a capital charge, and that only a fair charge for the use of it should be deducted from its earnings. The reasonable value of an exclusive license should be allowed for the times the play was presented.

The defendant should also be allowed (unless it be included in the exclusive license to use) the cost of the scenery, etc., which it obtained from Mrs. Hunt under the contract for the purchase of the play, and which I understand to be $4,708.93 (fifteenth finding of fact).

The defendant presented the play but once in the season of 1904–05, viz., for the last week, ending July 15, 1905, and incurred a loss of $730.49. This week is to be treated as a unit. The complainant gets no profits, and the defendant is entitled to no deduction from the earnings of the next season. For the same reason, the master should not have allowed the defendant any deduction for the loss in the season of 1907–08. Both these periods are to be entirely disregarded, unless upon a resettlement of the account in accordance with this opinion a balance of profits be shown.

The special master rightly refused to allow the defendant to deduct payments made to Mrs. Hunt as royalties for ownership of her late husband in connection with the play. This was necessarily included in the contract for the purchase of the play after his death.

[3] The special master also erred in allowing the defendant to deduct anything for the use of Kirk La Shelle's name, which was one of the considerations mentioned in the $25,000 salary contract. The defendant, as a corporation, had the right to use its own corporate name, and as the purchaser of the play had a right to advertise the fact that it was originally presented by Kirk La Shelle. It seems to me that Mrs. Hunt gave nothing, and could give nothing, to the defendant in this connection. Moreover, if it be assumed that she did confer any right in the premises, there is no proof of its value. The testimony is pure speculation and wholly unsatisfactory. As for financing the company, the special master rightly held that Mrs. Hunt did none, and none was needed. The salary contract, in respect to the foregoing features, though binding between the parties, was unreasonable and without consideration as against complainant's claim. Still the defendant is entitled to a credit for reasonable salaries paid to its officials, and the special master having found (eleventh finding of fact) that the payment of $7,500 to Mrs. Hunt for her services as president during the four theatrical seasons beginning with 1905–06 would be reasonable, and as during that period the defendant was presenting only two plays, it should have a credit of one-half that sum as appli-

cable to "The Heir to the Hoorah," to be equally divided between the four seasons.

The defendant, under its contract to pay Mrs. Hunt $100 every week the play was presented for services as manager, did pay her for considerable periods during which she was absent in Europe. The special master allowed these payments as against the complainant, and I will follow him in this respect with some doubt.

The defendant was properly charged with the amounts received for licenses of the play in the seasons 1908–09 and 1909–10, but, as heretofore held, should not have been credited with losses in prior seasons.

The foregoing will perhaps enable the parties to agree upon the amount of the decree to be entered in favor of the complainant, with costs; but, if they do not within 10 days after this opinion is handed down, the matter is referred to the special master to restate the account in accordance with this opinion.